UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:10-cr-28 (CFD) |
| | : | |
| LARRY CORBETT | : | |

## RULING ON MOTION TO SUPPRESS

The defendant, Larry Corbett, is charged with kidnapping, murder, and related drug and firearms offenses in connection with the death of George McPherson on January 14, 2008.[1] Corbett has moved to suppress oral and written statements that he made to police officers following his arrest on January 29, 2008, claiming that the statements were elicited in violation of his Fifth Amendment rights.[2] The Court held an evidentiary hearing on October 19, 2010, and an oral argument on January 7, 2011. The Court's findings of fact and conclusions of law follow.

---

[1] Corbett is charged in a six count superseding indictment with the following offenses: kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) (Count One); causing death through the use of a firearm in violation of 18 U.S.C. §§ 924(c), (j)(1) (Counts Two and Three); interference with commerce by robbery in violation of 18 U.S.C. § 1951(a)(1) (Count Four); possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(b)(1)(D) (Count Five); and use of a firearm during and in relation to a narcotics trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Six).

[2] Initially, Corbett also claimed a violation of his Sixth Amendment rights in his Motion to Suppress; however, he has not pursued this argument.

**I.    Findings of Fact**

On January 14, 2008, the Greenwich Police discovered a body with multiple gunshot wounds on Sterling Road in Greenwich, Connecticut. The victim was later identified as George McPherson of Bronx, New York. The Greenwich Police Department then conducted an investigation into McPherson's death and obtained an arrest warrant on January 29, 2008, from the Connecticut Superior Court for Larry Corbett.[3]

On January 29, 2008, at approximately 6:10 p.m., Corbett was arrested in Stamford, Connecticut, for conspiracy to commit murder pursuant to the state warrant. Detectives Charles Brown and Timothy Hilderbrand of the Greenwich Police Department made the arrest. After the arrest, Officer David Wilson of the Greenwich Police Department transported Corbett to the Greenwich Police station. Wilson did not speak to Corbett while transporting him in the patrol car.

Officer Wilson brought Corbett to the Greenwich Police's temporary headquarters, which were located on the third floor of the police and fire building.[4] Corbett was placed in an office located in the Detective Division and his handcuffs were removed. The office was an L-shaped room with one window and there were four desks. Detectives Brown and Hilderbrand and Officer Wilson were present in the room with Corbett. Brown and Hilderbrand were in plain

---

[3] Corbett was charged in the Connecticut Superior Court warrant with conspiracy to commit murder in violation of Sections 53a-48 and 53a-54a of the Connecticut General Statutes. After the defendant filed a motion to dismiss in the state court on jurisdictional grounds, the U.S. Attorney's Office for the District of Connecticut took over the prosecution of the case. Corbett was initially indicted in the District of Connecticut on January 21, 2010, and the superseding indictment was returned on February 2, 2010.

[4] The Greenwich Police Department's headquarters were being remodeled at the time of Corbett's arrest.

clothes and all three police officers were unarmed.  Corbett was seated in a chair.

At approximately 6:41 p.m., Detective Hilderbrand provided Corbett with a notice of rights form.[5]  Corbett read the form out loud, initialed each paragraph acknowledging that he understood what each provision meant, and signed the form at the bottom.  Corbett appeared literate at this time and did not appear to be suffering from any mental impairment or under the influence of drugs or alcohol.  Detective Brown was aware that this was not Corbett's first interaction with law enforcement officers; Brown knew that Corbett was a convicted felon and that Corbett had served time in a New York state prison.

After Corbett signed the notice of rights form, Detectives Brown and Hilderbrand questioned Corbett about some preliminary matters including his family, employment, and residence.  The detectives also inquired about Corbett's motor vehicle and the various cell phone numbers that he used.  The detectives had previously informed Corbett that he was arrested for conspiracy to commit murder but had not yet specifically disclosed the identity of the victim.  Detective Brown also told Corbett that police officers were simultaneously executing a search warrant on his house.

At approximately 7:55 p.m., prior to the detectives questioning Corbett on more substantive matters, Corbett stated that he would not answer any more questions until he was told more specifically what the detectives' questions pertained to.  Detective Hilderbrand then placed four photographs on the table in front of Corbett.  Three of the photographs depicted George

---

[5] The language in this notice of rights form (as well as the second notice of rights form that Corbett later signed) satisfies the <u>Miranda</u> requirements.

McPherson's body and the fourth photograph was of a minivan.[6]  Upon seeing the photos, Corbett's emotions changed—Corbett sunk into his chair, became "visibly upset" and quiet, and appeared surprised.  At this juncture, Corbett pointed to the notice of rights form that he had signed and stated, "That form says I need a lawyer, so I think I need a lawyer."  All questioning ceased at that point and Detective Hilderbrand left the office for a short time to gather the necessary forms for processing Corbett.  Detective Brown remained in the room and asked Corbett whether there was a particular lawyer that he wished to speak with.  Corbett did not identify a lawyer and Brown informed Corbett that one would be appointed for him in court the following day.

While Detective Hilderbrand was out of the room, Corbett observed a Masonic ring on Detective Brown's hand.[7]  Upon observing Detective Brown's Masonic ring, Corbett appeared relieved and asked Detective Brown if he "was on the square."  Detective Brown understood Corbett to be asking whether he was a member of the Masonic fraternity, to which Detective Brown answered in the affirmative.[8]  Corbett informed Detective Brown that his grandfather was also a Mason and that he considered his grandfather to be his mentor.  Detective Brown

---

[6] The minivan apparently belonged to Corbett.

[7] Detective Brown's ring was a Masonic ring that he has worn for approximately ten years.  The ring has a "G" in the middle with two Masonic symbols on its face—a builder's square and compass.

[8] Detective Brown testified that the Masonic fraternity is based on "doing the right thing for brother man," treating other Masons with respect, and protecting a "Brother Mason" when possible.  A "Freemason" is "[a] member of a (now international) society established for mutual help and fellowship, whose traditions and rituals make symbolic use of or reference to the tools of medieval stonemasons (notably the square and compasses)."  Oxford English Dictionary Online (Sept. 2010).

responded, stating that "[Corbett's] grandfather must be a good man." Detective Brown did not question Corbett or initiate conversation with Corbett during this period of time.

Corbett then asked Detective Brown whether he could call his grandfather "for advice on what to do with a Brother Mason," and Detective Brown dialed the phone for Corbett. Corbett spoke to his grandfather, in the presence of Brown, Hilderbrand, and Wilson, and explained that he was speaking to a fellow Mason and that he was looking for some advice. Corbett then told Detective Brown that his grandfather wanted to speak to him and handed him the phone. Once on the phone, in Corbett's presence, Detective Brown identified himself as a Mason to Corbett's grandfather, stated that he was a detective investigating a homicide, and that Corbett had been arrested in connection with that homicide. Detective Brown further stated that Corbett's bond was $750,000 and that Corbett had invoked his right to an attorney. Detective Brown told Corbett's grandfather that he was looking to get Corbett's "side of the story" and assured him that he would treat Corbett as a "Brother Mason."[9] Corbett's grandfather asked to speak to Corbett again and Detective Brown handed the phone back to Corbett. Corbett briefly spoke to his grandfather, stating that "I made a few bad decisions Grandfather, but I did not kill any man," and ended the call shortly thereafter.

Following the telephone call to his grandfather, Corbett appeared relieved. Corbett indicated that he felt comfortable and wished to speak with the detectives about McPherson's death. The detectives provided Corbett with a second notice of rights form, which Corbett read, initialed, and signed at approximately 8:09 p.m. After signing the form, but prior to any further

---

[9] Detective Brown testified that treating one as "Brother Mason" means that you treat that person with respect, dignity, and honesty.

questioning, Detective Hilderbrand asked Corbett whether he understood the rights that he was waiving. Corbett responded, "Yes. I'm comfortable now. I spoke with my Grandfather, [Detective Brown] spoke with my Grandfather. I'm comfortable."

Detectives Brown and Hilderbrand subsequently questioned Corbett regarding George McPherson's death, and Corbett provided a lengthy account of McPherson's shooting, but denied his responsibility for it.[10] Corbett also described transporting McPherson's body to Greenwich. Throughout the interrogation, Corbett was provided with water and the opportunity to use the restroom upon request and he was provided a meal at approximately 10:00 p.m. Corbett's wife was also brought up to the office at some point during the evening and Corbett was allowed to speak with her in person.

During the course of the questioning, Detectives Brown and Hilderbrand identified several inconsistencies in Corbett's story related to the death of McPherson. The detectives told Corbett that his account of what happened was not consistent with the evidence that had been recovered. After the detectives told Corbett that his story did not "make sense," Corbett admitted that he had not been entirely forthcoming in his original story. Corbett proceeded to provide the detectives with a more detailed version of the events occurring on January 14, 2008, but still denied that he committed the murder. Corbett did not ask to cease the interview or speak with an attorney at any time after signing the second notice of rights form. The detectives did not raise their voices or display violence or physical intimidation toward Corbett at any time during the questioning.

---

[10] Officer Wilson was not involved in questioning Corbett at any point during the night—Wilson stood at the door of the office.

At approximately 10:30 p.m., the questioning of Corbett ended and he began to draft (in his own handwriting) a written statement. At approximately 1:10 a.m. on January 30, 2008, Corbett concluded his written statement, which was three pages in length. Corbett read his statement again and swore to its truth.

## II.  Conclusions of Law

Corbett claims that his waivers of rights and the subsequent oral and written statements that he made to the police were coerced and should be suppressed.[11]

The Fifth Amendment to the U.S. Constitution protects against compelled self-incrimination; however, a defendant may waive this right so long as the waiver is voluntary. See United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991). "The Supreme Court has identified the key inquiry in determining whether a violation of the right against compelled self-incrimination has occurred as 'whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer.'" United States v. Jones, 299 F.3d 103, 110 (2d Cir. 2002) (quoting Garrity v. New Jersey, 385 U.S. 493, 496 (1967)). "[T]he question in each case is whether the defendant's will was overborne at the time he confessed." Lynumn v. Illinois, 372 U.S. 528, 534 (U.S. 1963); see Green v. Scully, 850 F.2d 894, 900 (2d Cir. 1988).

In determining the voluntariness of a defendant's statement, the Court must determine, first, whether the defendant knowingly and voluntarily waived his Miranda rights, and, second, whether the defendant's subsequent statement itself was voluntarily made. The same standard

---

[11] Corbett waived his Miranda rights on two separate occasions following his arrest on January 29, 2008. He signed the first notice of rights form at 6:41 p.m. and the second notice of rights form at 7:55 p.m. Thus, the Court's analysis applies both to the voluntariness of the two waivers and to the statements Corbett made after each waiver.

applies to both analyses. See Colorado v. Connelly, 479 U.S. 157, 170 (1986) ("There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context."); U.S. v. Ul Islam, No. 3:04CR305, 2006 WL 1168015, at *7 (D. Conn. Apr. 28, 2006) (applying the same standard in analyzing whether the defendant's waiver of his Miranda rights and the defendant's confession were voluntary). Courts assessing whether a defendant's waiver of his Miranda rights and inculpatory statements were voluntary must look at the totality of the circumstances under which the waiver and statements were made. See Nelson v. Walker, 121 F.3d 828, 833 (2d. Cir. 1997); United States v. Kaba, 999 F.2d 47, 51 (2d Cir. 1993) ("In evaluating the voluntariness of confessions, we look at the totality of the circumstances in which they were given to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." (internal quotations omitted)); Green, 850 F.2d at 901 ("There is only one guide—the totality of the circumstances rule."). Factors a district court should weigh in this analysis include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials." Nelson, 121 F.3d at 833. No single factor is dispositive; the principal inquiry in determining whether the suspect's waiver of rights and inculpatory statements were obtained by coercion requires a "careful evaluation of the totality of the surrounding circumstances." See Green, 850 F.2d at 901; Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973) (noting that the analysis does not "turn[ ] on the presence or absence of a single controlling criterion . . . [but rather] reflect[s] a careful scrutiny of all the surrounding circumstances").

The government bears the burden of proving, by a preponderance of the evidence, that a defendant's waiver of his Miranda rights and subsequent inculpatory statements were voluntarily made. See Colorado, 479 U.S. at 168–69 (voluntariness of Miranda waiver); Lego v. Twomey, 404 U.S. 477, 489 (1972) (voluntariness of confession).

As mentioned above, one factor to consider is the accused's experience, background, and education. In considering this factor, courts focus on whether the accused was aware of the rights he was waiving. See Green, 850 F.2d at 902. The evidence shows that Corbett is literate and that he was not under the influence of any drugs or alcohol at the time of his interrogation. On two separate occasions, Corbett read aloud his rights, initialed next to each paragraph on the notice of rights form indicating that he understood his rights, and signed at the bottom of the form. These actions support a finding that Corbett was capable of understanding his rights and knowingly waived them. See United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996). But see North Carolina v. Butler, 441 U.S. 369, 373 (1979) (noting that although the express signing of a waiver is strong proof of the validity of the waiver, it is not necessarily sufficient). In addition, Corbett's invocation of his constitutional right to an attorney also demonstrates that he understood the rights he was waiving when he signed the notice of rights forms—when the detectives began asking Corbett more substantive questions about the murder of McPherson, Corbett stated, "That form says I need a lawyer, so I think I need a lawyer." See United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (finding that the suspect's invocation of his rights was evidence of the suspect's ability to understand his rights). Further, Corbett's written statement was fairly well-written and coherent. While the evidence shows that it took Corbett approximately two-and-a-half hours to write a three-page statement, that long period of time does

not necessarily support an adverse conclusion as to Corbett's intelligence or education. Any suspect, including Corbett, would be deliberate in preparing a detailed written statement, especially when charged with conspiracy to commit murder. Finally, while neither Detective Brown nor Detective Hilderbrand were aware of whether Corbett had received a Miranda advice prior to January 29, 2008, or was specifically familiar with the rights reflected in such an advice, Detective Brown knew that Corbett was a convicted felon, who had previously served a sentence in a New York state prison. But see Anderson, 929 F.2d at 99 (finding that the accused's background did not support a finding of a voluntary confession because, despite being arrested twelve previous times, nothing in the record revealed that the suspect had previously been advised of his Miranda rights or that he had previously waived his rights).

The conditions of Corbett's interrogation also support a finding that Corbett's waivers and inculpatory statements were voluntary. In analyzing this factor, courts consider, among other things, where the interrogation was held, the length of the detention, and the presence of counsel. See Green, 850 F.2d at 902. Corbett was interviewed in an office at the Greenwich Police Department's temporary headquarters. Although Detective Brown testified that the temporary space was "cramped," the evidence shows that the office itself was not unduly coercive. See, e.g., Mincey v. Arizona, 437 U.S. 385, 398–99 (1978) (conducting an interrogation while the suspect was in the intensive care unit of a hospital). The length of Corbett's interrogation was also not unreasonably long. Corbett signed the first notice of rights form at 6:41 p.m and the detectives questioned Corbett until approximately 7:55 p.m., at which time Corbett invoked his right to an attorney. After calling his grandfather, Corbett signed the second notice of rights form at 8:09 p.m and the detectives questioned Corbett until around 10:00 p.m., when Corbett was

given a meal. While Corbett was in the detectives' office for approximately seven hours, Corbett was only actually questioned for approximately three hours. Finally, although Corbett did not have counsel present during the questioning, he was advised of his right to an attorney and voluntarily waived that right on two separate occasions. All interrogations may be implicitly intimidating, but based on the evidence before this Court, there is nothing in the record to suggest that the conditions of Corbett's interrogation were coercive.

The conduct of law enforcement officers during an interrogation is another important factor that the Court must evaluate in determining whether a suspect voluntarily waived his Miranda rights and whether the statements the suspect made to police were voluntary. See Green, 850 F.2d at 902. In analyzing this factor, courts consider: (1) the nature of the questioning; (2) the failure to inform the accused of his constitutional rights; (3) whether there was any physical abuse; (4) whether the accused was restrained in handcuffs during the interrogation; and (5) whether the accused was deprived of things such as food, water, sleep, or clothing. Id. In addition, courts consider whether the police engaged in psychologically coercive techniques, including promises of leniency. Id. The Court finds that the conduct of Detectives Brown and Hilderbrand and Officer Wilson did not significantly interfere with the voluntariness of Corbett's waivers and inculpatory statements: Corbett was adequately advised of his rights on two separate occasions; the length and nature of the detectives' questioning was fair; there was no physical or verbal abuse of Corbett; Corbett was not handcuffed at any point during the interrogation; Corbett was given a meal; Corbett had access to water and the restroom upon request; Corbett was permitted to speak with his wife in person; and Corbett was not deprived of any fundamental necessity such as sleep or clothing.

Corbett claims, however, that after invoking his right to counsel, Detective Brown took advantage of Corbett's interest in the Masonic fraternity and thus coerced Corbett to waive his right to an attorney as well as the other rights subject to the Miranda advice.[12]  Specifically, Corbett asserts that Detective Brown's promise to treat Corbett as a "Brother Mason" was a promise of leniency and that such promise should render Corbett's waiver of his rights and subsequent oral and written statements involuntary.

"In assessing the totality of the circumstances, vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion."[13]  United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002); see United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." (quoting United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987)).

---

[12] After being advised of his Miranda rights and invoking his right to counsel, a defendant "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 485 (1981); see Minnick v. Mississippi, 498 U.S. 146, 153 (1990); United States v. Plugh, 576 F.3d 135, 143 (2d Cir. 2009).  Despite previously invoking his right to counsel, the evidence shows that Corbett reinitiated the conversation with Detective Brown on his own volition.  Corbett does not contest this issue.

[13] Corbett relies on the Supreme Court's holding in Bram v. United States, 168 U.S. 532, 542–43 (1987) that "[a] confession or inculpatory statement is not freely and voluntarily given if it has been elicited by direct or implied promises, however slight."  Both the Supreme Court and Second Circuit, however, have since rejected a literal interpretation of Bram.  See Arizona v. Fulminante, 499 U.S. 279, 285 (1991); United States v. Ferrara, 377 F.2d 16, 17 (2d Cir. 1967).

The evidence shows that the representation Detective Brown made to Corbett was vague and, when weighed in consideration with the other factors, is insufficient to find that Corbett's waiver and subsequent statements were not voluntarily made. Shortly after invoking his right to an attorney, Corbett, by his own initiative, asked Detective Brown if he "was on the square," and also stated that his grandfather was a Mason. Detective Brown's only response, at that time, was to indicate that he also was a Mason and that Corbett's "grandfather must be a good man." The evidence shows that Corbett's subsequent phone call to his grandfather was also at his own request, not at the urging of Detective Brown—Corbett asked to call his grandfather "for advice on what to do with a brother Mason." It is unknown what advice Corbett's grandfather gave Corbett on the phone; however, Detective Brown told Corbett's grandfather that he was looking to get Corbett's "side of the story" and assured him that he would treat Corbett as a "Brother Mason." Corbett was in the same room as Detective Brown while Detective Brown spoke to Corbett's grandfather and presumably heard Detective Brown's statements to his grandfather. In fact, the evidence shows that Detective Brown's conversation with Corbett's grandfather had at least some influence on Corbett's decision to sign the second notice of rights form and speak with the detectives—when Detective Hilderbrand asked Corbett after the phone call whether he understood the rights he was waiving by signing the second notice of rights form, Corbett responded, "Yes. I'm comfortable now. I spoke with my Grandfather, [Detective Brown] spoke with my Grandfather. I'm comfortable."

Despite Corbett's apparent acknowledgment of Detective Brown's assurance to treat him as a "Brother Mason," that does not rise to the level of an explicit promise of leniency, such as when a police officer promises to drop a charge against a suspect or recommend leniency in

-13-

sentencing in exchange for a suspect waiving his right to an attorney. Even if Detective Brown's statement could be considered a promise of leniency, courts have repeatedly held that such a representation is just one factor to consider in the totality of the circumstances test. See Gaines, 295 F.3d at 299.

Moreover, "the Fifth Amendment is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" Connelly, 479 U.S. at 170 (quoting Oregon v. Elstad, 470 U.S. 298, 305 (1985)). Despite Detective Brown's promise to treat Corbett as a "Brother Mason," the evidence shows that it was, in large part, Corbett's feelings for his grandfather and the Masonic fraternity that ultimately led him to speak with the detectives. Because such moral coercion did not principally come from Detective Brown or Detective Hilderbrand, it is of little weight in determining whether Corbett voluntarily waived his rights. This conclusion is supported by a recent decision by the United States Supreme Court from the last term. In Berghuis v. Thompkins, a police officer used the suspect's belief in God to his advantage in obtaining the suspect's statement:

> About 2 hours and 45 minutes into the interrogation, Helgert [the police officer] asked Thompkins, "Do you believe in God?" Thompkins made eye contact with Helgert and said "Yes," as his eyes "well[ed] up with tears." Helgert asked, "Do you pray to God?" Thompkins said "Yes." Helgert asked, "Do you pray to God to forgive you for shooting that boy down?" Thompkins answered "Yes" and looked away.

Berghuis v. Thompkins, 130 S. Ct. 2250, 2257 (U.S. 2010) (second alteration in original) (internal citations omitted). The Supreme Court held that the police officer's attempt to appeal to the suspect's religious beliefs was not enough to render the suspect's subsequent incriminating statement involuntary based on the totality of the circumstances. See id. at 2263. In contrast to

Berghuis, Corbett, not Detective Brown, initiated the discussion about the Masons. Furthermore, Corbett indicated that he wanted to waive his rights and discuss the homicide after speaking to his grandfather. Neither Detective Brown nor Detective Hilderbrand urged or even asked Corbett to waive his rights prior to Corbett expressing his desire to do so. Thus, despite whatever influence Detective Brown's conversation with Corbett's grandfather may have had on Corbett, the evidence shows that Corbett voluntarily made the choice to waive his rights and speak with the detectives.[14]

Based on the totality of the circumstances, the Court concludes that Corbett knowingly and voluntarily waived his rights before he discussed the circumstances of McPherson's homicide and that Corbett's oral and written statements were also voluntarily made.[15] Even though Corbett may have relied, in part, on Detective Brown's promise to treat him as a "Brother Mason," that circumstance, when considered in light of the totality of the circumstances, is not enough to find that Corbett's free will was overcome by official coercion.

---

[14] Courts have held that the "good guy" approach, similar to what the defendant alleges Detective Brown utilized, is a permissible method of interrogation. See Mastin v. Senkowski, 297 F. Supp. 2d 558, 604 (W.D.N.Y. 2003) ("[T]he Supreme Court has indicated that an interrogator's friendly or sympathetic demeanor is not in itself enough to render a confession involuntary."). "[I]ndications of sympathy or assistance [by a police officer] do not constitute psychological coercion." Id.

[15] This conclusion applies to both of Corbett's waivers and to the statements Corbett made after each waiver.

### III. Conclusion

Accordingly, the defendant's motion to suppress [Dkt #41] is DENIED.

SO ORDERED this 19th day of January 2011, at Hartford, Connecticut.


/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**